## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JACQUELINE A. MIRAGLIA, | * | C.A. No. _____ |
| | * | |
| Plaintiff, | * | DEMAND FOR TRIAL BY JURY |
| | * | |
| v. | * | |
| | * | |
| UNITED INSURANCE HOLDINGS CORP. | * | |
| and UNITED PROPERTY & CASUALTY | * | |
| INSURANCE COMPANY, INC., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

## COMPLAINT

COMES NOW, Jacqueline A. Miraglia, by and through her undersigned attorney, who brings this Complaint against Defendants United Property & Casualty Insurance Company, Inc. and United Insurance Holdings Corp., alleging as follows:

## FACTS

### Parties

1. Plaintiff Jacqueline A. Miraglia ("Plaintiff") is an adult-female Delaware resident who may be contacted for purposes of this litigation through her attorney, Daniel C. Herr, Esq., at 1225 N. King Street, Suite 1000, Wilmington, DE 19801.

2. Defendant United Property & Casualty Insurance Company, Inc. is organized in the State of Florida. Its registered agent is listed as "Chief Financial Officer", 200 E. Gaines Street, Tallahassee, Florida 32399.

3. Defendant United Insurance Holdings Corp. is organized in the State of Delaware. Its registered agent is National Registered Agents, Inc., 1209 Orange Street, Wilmington, DE 19801.

United Property & Casualty Insurance Company, Inc. and United Insurance Holdings Corp. shall together be referred to as the "Defendants".

4. Per Defendants' 2020 Form 10-K, Defendants employed 478 employees as of December 31, 2020.

## Jurisdiction and Venue

5. This Court has jurisdiction over the claims asserted herein as Plaintiff worked in Delaware for Defendants and Defendants elected to employ Plaintiff in the State of Delaware at certain relevant times (further, Defendant United Insurance Holdings Corp. is organized in the State of Delaware). Venue is proper for the same reasons.

6. This is a civil action for damages arising under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967.

## Common Allegations of Fact

7. Defendants hired Plaintiff as Director of Claims on or about July 5, 2016.

8. Plaintiff was born in February 1961.

9. Shortly thereafter, Defendants hired Scott St. John as their Chief Claims Officer.

10. Plaintiff was responsible for dramatic achievements to the benefit of Defendants, including but not limited to the following: structuring a Subrogation department, including a new in-house Subrogation team with customized workflows responsible for over $14.5 million in collections where previously all subrogation claims where outsourced to a law firm for a fee; developing "Subro Tracker", a customized subrogation management tool (working with a vendor) that improved claims handling efficiency and successful outcomes; training the Claims department on subrogation opportunity identification and early referrals, and creating a new claims quality assurance team that included UPC's first Claim audit deliverable critical for SOX compliance;

developing all audit content including best practices questions and scoring metrics, executive reporting and compliance; developed and launched "Claim Toolkit", an audit management platform used to conduct and retain all of Defendants' audits for regulatory compliance; training the Claims department on Audit content and processes.

11. Defendants, at times, recognized Plaintiff's achievements.

12. Summing it up well, former President for Defendants John Forney told Plaintiff on or around June 27, 2020, as he departed, the following: "You have always been a shining star at UPC, and I am grateful for everything you did during my tenure to keep the company moving forward. UPC[1] is lucky to have you."

13. Nevertheless, St. John consistently favored Plaintiff's substantially younger, male colleagues. For example, St. John rarely included Plaintiff's accomplishments through company-wide communications controlled by him, but routinely broadcasted purported accomplishments by Plaintiff's substantially younger, male colleagues. Upon information and belief, some or all of these substantially younger, male colleagues had experienced setbacks in various metrics, loss of staff due to leadership issues, and human resources complaints.

14. Further, St. John provided Plaintiff's substantially younger, male colleagues with promotions, additional staff, and tiers of management around them, all the while ignoring Plaintiff's requests for a promotion and for adequate staffing. As is detailed herein, Plaintiff's staff for her teams consistently lessened over the years despite her requests for additional staffing.

15. These substantially younger, male colleagues include Tim Cotton (late 40s), Todd Stoner, early 50s), John Henley (mid 30s), Jeff Bergstrum (mid 40s), and David Bradley (early 40s) (all ages upon information and belief).

---

[1] An acronym for Defendants.

16. Plaintiff first inquired with St. John about a promotion to Vice President in or around July 2017; St. John responded that he could not promote Plaintiff because there was no VP position into which she could be promoted.

17. Around this timeframe, Plaintiff expressed frustration to St. John about a lack of opportunity for career advancement; Plaintiff further expressed that since Cotton was hired (in or around the early-Summer 2017), Plaintiff was kept out of the loop and made to feel invisible regarding leadership discussions. Plaintiff told St. John that she perceived this to be unfair treatment. St. John was essentially nonresponsive to Plaintiff's concerns.

18. In or around the Fall 2018, Plaintiff informed Forney she was going to resign.

19. Forney asked if there was anything he could do to maintain Plaintiff's employment with Defendants. Forney took efforts on behalf of Defendants to then allow Plaintiff to work from home in Delaware. Thereafter, St. John informed Plaintiff that she was approved to work from home in Delaware.

20. To facilitate Plaintiff's work-from-home arrangement, Defendants provided plaintiff with two computer monitors, a laptop, mouse, and a printer. Defendants also paid for Plaintiff to travel to and from Florida for business purposes on a regular basis.

21. Plaintiff continued to excel as a remote worker, just as she had when working in Florida.

22. In the Summer 2020, St. John promoted Stoner and Henley to Vice President positions. Defendants provided no notice, *i.e.*, no job posting or announcement (to which Plaintiff is aware) that these positions were available. At this time, Plaintiff was still under the belief that there was no Vice President position to which she could be promoted to per St. John's assertion years prior. St. John was of course aware that Plaintiff desired such a promotion.

23. Plaintiff had nearly 31 years of experience working for insurance companies at this time, while Henley had approximately five months. Similarly, Stoner was less tenured having, upon information and belief, approximately 24 years of experience working for insurance companies.

24. In or around the last week of July 2020, Plaintiff called Defendants' Human Resources Director Alycia Weigley to complain of gender and age discrimination by St. John. Plaintiff asserted, *inter alia*, that she had been continuously demoted (in duties), St. John had effectively made her invisible, and St. John had shown favoritism towards hiring, supporting, and promoting younger males that were Plaintiff's peers.

25. Strangely, Weigley informed Plaintiff that she needed to discuss her discrimination claims directly with St. John. St. John subsequently scheduled a video call with Plaintiff and Weigley that occurred on or about July 28, 2020 at 4:30 p.m.

26. During this call, Plaintiff raised detailed allegations of adverse and disparate treatment in comparison to her younger, male colleagues. Plaintiff further referenced her excellent performance and having never received any negative performance commentary or reviews.

27. Instead of responding to the substance of Plaintiff's allegations, St. John repeatedly said that this was the first time he had ever been accused of discrimination and expressed displeasure with Plaintiff having first complained to human resources before bringing the issues to his attention.

28. St. John also claimed that Plaintiff was not promoted because she was a remote employee. Plaintiff responded that she was unaware of any policy disallowing this. An upon information and belief, no such company policy existed. St. John did not meaningfully acknowledge Plaintiff's response, instead responding that he was "sorry [Plaintiff's] feelings were hurt" (or similar language).

29. Plaintiff requested a promotion to Senior Director during this call.  Sometime later, St. John called Plaintiff and informed her that he could not promote Plaintiff to a Senior Director position because that position also did not exist.

30. Merely two business days later, on or about August 3, 2020, Weigley called Plaintiff and summary informed Plaintiff that she did not think Plaintiff was discriminated against.  Weigley also warned Plaintiff not to "mess up a good thing" (or similar language).

31. Upon information and belief, Defendants conducted no meaningful investigation of Plaintiff's allegations based on Weigley's conclusions being made merely days after Plaintiff supplied her concerns.

32. After Plaintiff's late-July 2020 complaint of discrimination, St. John caused her working conditions to worsen.  At this point, Plaintiff was reporting to Henley.  St. John excluded Plaintiff from leadership meetings with him (where she had previously been included but marginalized during the same as is detailed herein) wherein strategic plans for Plaintiff's teams were being discussed.  Plaintiff would provide strategic planning-information to Henley, and Henley would engage in the meetings with St. John and other leaders to make decisions concerning the same.

33. Essentially, St. John stopped having any meaningful direct communications with Plaintiff.

34. In or around January 2021, Plaintiff emailed Henley to discuss a 2021 staffing plan for Plaintiff's two teams.  Both teams were without a manager at that time and continued to be insufficiently staffed.  Plaintiff was assisting with the claims work to alleviate stresses on the teams, as well as acting as both manager, data manager and director to each of her teams.  Moreover, since Plaintiff complained to St. John about discrimination, Plaintiff received increased work demands from St. John and Henley.  Plaintiff required additional analysts, managers, as well

as a data manager for her teams to properly support the normal workload, as well as the increasing demands communicated by St. John and Henley.

35. On or about January 15, 2021, Plaintiff spoke to Henley as a follow-up to the email described in the preceding paragraph. Plaintiff asserted, as she had before, her concerns of being treated disparately compared to her younger male Director-colleagues related to staffing. Plaintiff asked Henley why her younger male colleagues were being treated more favorably by St. John in comparison to her – Plaintiff stated that her performance has always been exceptional and that she did not deserve this treatment from St. John.

36. Henley agreed Plaintiff needed more staff, stating "if anyone can get Scott to give you staff it's me – I'm good at that – there should be two Team Leads in Subrogation with four adjusters to each of them, both reporting up to a manager who reports to you; QA should have a manager reporting to you and up to five analysts and a data manager" (or similar language).

37. Henley ended the conversation by stating he would meet with St. John and get back to Plaintiff.

38. Less than a week later, on or about January 21, 2021, former General Counsel for Defendants Brad Kalter informed Plaintiff that her employment was terminated effective immediately (effective the same day). Kalter provided no business rationale, nor did he cite any performance concerns (as there were none). During this conversation, Plaintiff asserted to Kalter that she was being terminated in retaliation for her complaints of age and gender discrimination merely days prior. Kalter did not respond to this, let alone deny it. It was worth mentioning that, to the best of Plaintiff's recollection, this termination meeting was falsely conveyed to Plaintiff to be a meeting regarding her staffing concerns.

39. To the best of Plaintiff's recollection, she had never received any criticism of her performance through a performance review or otherwise throughout her four-plus years working for Defendants.

40. At the time Defendants terminated Plaintiff on or about January 21, 2021, Plaintiff was the only female Claims leader (Director-level and above), and the oldest member of the Claims leadership team under St. John.

41. After Defendants terminated Plaintiff, they promoted two younger females to positions wherein they assumed and performed Plaintiff's duties: Rosie Jacomino (mid 30s) and Tracey Reed (late 30s) (ages upon information and belief).

42. Over the course of Plaintiff's employment with Defendants, she went from managing approximately all the first party Claims teams for 12 states, led by several managers who oversaw adjusters (approximately 50 plus employees) along with all independent adjuster firms, to managing approximately seven people for two teams at the time of her termination.

43. Plaintiff's performance has been exceptional at times.

44. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") for discrimination and retaliation in violation of Title VII and the ADEA.

45. The EEOC issued Plaintiff a Right to Sue Notice on July 21, 2021 (attached hereto as **Exhibit A**).

### COUNT 1:  FAILURE TO PROMOTE (THE JULY 2020 PROMOTIONS) IN VIOLATION OF TITLE VII (DISCRIMINATION BASED ON SEX)

46. Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with these causes of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

47. As is detailed herein, Defendants promoted Henley and Stoner as opposed to Plaintiff.

48. Plaintiff was and is more qualified and tenured than Henley and Stoner; Plaintiff's performance was exceptional.

49. Defendants were aware of Plaintiff's desire to be promoted.

50. Defendants did not post, advertise, or otherwise alert Plaintiff about the opportunity to be promoted.

51. Defendants falsely claimed that Plaintiff could not be promoted because she was a remote worker.

52. As a result, Plaintiff has suffered economic and general damages.

### COUNT 2:  FAILURE TO PROMOTE (THE JULY 2020 PROMOTIONS) IN VIOLATION OF THE ADEA

53. Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with these causes of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

54. As is detailed herein, Defendants promoted Henley and Stoner as opposed to Plaintiff.

55. Plaintiff was and is more qualified and tenured than Henley and Stoner; Plaintiff's performance was exceptional.

56. Defendants were aware of Plaintiff's desire to be promoted.

57. Defendants did not post, advertise, or otherwise alert Plaintiff about the opportunity to be promoted.

58. Defendants falsely claimed that Plaintiff could not be promoted because she was a remote worker.

59. As a result, Plaintiff has suffered economic and general damages.

## COUNT 3: TERMINATION OF EMPLOYMENT IN VIOLATION OF THE ADEA (DISCRIMINATION)

60. Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with these causes of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

61. As is detailed herein, Defendants consistently favored Plaintiff's younger counterparts.

62. Defendants provided Plaintiff no meaningful explanation for her termination.

63. Plaintiff was the oldest member of Defendants' Claims leadership team under St. John.

64. Defendants replaced Plaintiff with two younger individuals as is detailed herein.

65. As a result, Plaintiff has suffered economic and general damages.

## COUNT 4: TERMINATION OF EMPLOYMENT IN VIOLATION OF TITLE VII (RETALIATION)

66. Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with these causes of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

67. Plaintiff reported what she in good faith believed to be discrimination in violation of the law on January 15, 2021.

68. Merely days later, Defendants terminated Plaintiff, providing no rationale for its decision.

69. Plaintiff's performance was, at all times, exceptional.

70. Defendants have no legitimate, non-retaliatory or non-discriminatory reason for their termination of Plaintiff's employment.

71. As a result, Plaintiff has suffered economic and general damages.\

## COUNT 5:  TERMINATION OF EMPLOYMENT IN
## VIOLATION OF THE ADEA (RETALIATION)

72. Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with these causes of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

73. Plaintiff reported what she in good faith believed to be discrimination in violation of the law on January 15, 2021.

74. Merely days later, Defendants terminated Plaintiff, providing no rationale for its decision.

75. Plaintiff's performance was, at all times, exceptional.

76. Defendants have no legitimate, non-retaliatory or non-discriminatory reason for their termination of Plaintiff's employment.

77. As a result, Plaintiff has suffered economic and general damages.

### **Prayer for Relief**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

A.   All lawful economic and compensatory damages in an amount to be determined.

B.   Liquidated damages and/or punitive damages in an amount to be determined.

C.   A sum to account for Plaintiff's increased tax burden as a result of receiving her claimed damages in lump sum.

D.   Reasonable attorneys' fees.

E.   Pre and post-judgment interest.

F.   Costs.

G.   Trial by Jury.

H.   Such other relief as this Court deems just and equitable.

                                      Respectfully,

                                      **LAW OFFICE OF**
                                      **DANIEL C. HERR LLC**

Dated:  August 18, 2021          */s/Daniel C. Herr*
                                      Daniel C. Herr, Esquire, Bar. I.D. 5497
                                      1225 N. King Street, Suite 1000
                                      Wilmington, DE 19801
                                      302-483-7060 (tel) | 302-483-7065 (fax)
                                      dherr@dherrlaw.com
                                      *Attorney for Plaintiff*